IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:09-CV-351-FL

| | | |
|---|---|---|
| WAYNE CHEW, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| PROGRESSIVE UNIVERSAL | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the court on defendant's motion for summary judgment (DE # 11) and plaintiff's motion for partial summary judgment (DE # 13). These motions have been fully briefed. Also pending is defendant's uncontested motion to exclude the testimony of plaintiff's designated expert witness Donald L. Dinsmore (DE # 12). The issues raised by these motions are ripe for adjudication. For the reasons that follow, defendant's motion for summary judgment is granted, plaintiff's motion for partial summary judgment is denied, and defendant's motion to exclude the testimony of Mr. Dinsmore is denied as moot.

## STATEMENT OF THE CASE

Plaintiff initiated this action in Cumberland County Superior Court on June 19, 2010. Plaintiff alleges that defendant, the provider of a liability insurance policy for plaintiff's automobile, acted improperly in its handling of plaintiff's claim for personal injuries under the policy's uninsured motorist provision. In his complaint, plaintiff sets forth three causes of action: breach of contract, violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen.

Stat. § 75-1.1 et seq., and punitive damages for breach of the covenant of good faith and fair dealing. Plaintiff does not seek to recover on the underlying uninsured motorist claim; plaintiff has already received an award of $38,346.80 for that claim in arbitration. Rather, plaintiff challenges defendant's actions in taking an adversarial posture and attempting to settle plaintiff's uninsured motorist claim for a fraction of its value as established in arbitration.

On August 5, 2010, defendant removed the action to this court, alleging that diversity of citizenship existed between the parties and that the amount in controversy between them exceeded $75,000.00. See 28 U.S.C. §§ 1332, 1441. Defendant answered the complaint on August 12, 2009. Defendant admitted some of the factual predicates underlying plaintiff's claim, but denied liability.

On April 1, 2010, following the close of discovery, defendant filed for summary judgment and plaintiff filed for partial summary judgment. Also on that date, defendant moved to exclude the expert testimony of Mr. Donald L. Dinsmore. Plaintiff responded to defendant's summary judgment motion on April 21, 2010, and defendant replied on May 10, 2010. Defendant responded to plaintiff's partial summary judgment motion on April 26, 2010. Plaintiff did not respond in opposition to defendant's motion to exclude the testimony of Mr. Dinsmore.

## STATEMENT OF THE UNDISPUTED FACTS

On April 13, 2006, plaintiff was seated in the passenger seat of his 1993 Saturn when a hit-and-run driver in a stolen sports utility vehicle ("SUV") sideswiped plaintiff's vehicle. Plaintiff and his wife, who was driving the Saturn, were waiting at a traffic light to exit the parking lot of Cape Fear Valley Hospital. Plaintiff had been discharged from the hospital shortly before the accident, having undergone his sixth back surgery in seven years to address ongoing symptoms from a workplace injury sustained years earlier.

Immediately after the accident, an ambulance transported plaintiff back to the hospital for treatment in the emergency room ("ER"). There, physicians examined him and took x-rays. The ER physicians determined that there were no changes in the radiology findings of plaintiff's spine compared to the period immediately before the accident, and that there was no basis to admit plaintiff for further treatment. Plaintiff was released from the ER, with instructions to follow his prior discharge instructions and to follow up with his neurosurgeon as planned.

At the time of the accident, plaintiff was insured under a motor vehicle insurance policy issued by defendant. The policy afforded bodily injury coverage up to $50,000.00. Pursuant to the policy, defendant was required to pay "compensatory damages which an insured is legally entitled to recover from the owner or operator of an uninsured motor vehicle because of . . . [b]odily injury sustained by an insured and caused by an accident." (Def.'s Mot. Summ. J. Ex. 1 at 19.) The policy stated that in the event that defendant and the insured "do not agree . . . [w]hether [the] insured is legally entitled to recover compensatory damages from the owner or driver of an uninsured motor vehicle . . . or . . . [a]s to the amount of such damages[,] the insured may demand to settle the dispute by arbitration." (Id. at 25.) The policy obligated an insured individual seeking coverage to, among other things, (1) "[c]ooperate . . . in the investigation, settlement or defense of any claim or suit[,]" (2) "[s]ubmit . . . to physical exams by physicians . . . [and] examinations under oath[,]" and (3) "[a]uthorize [defendant] to obtain . . . medical reports." (Id. at 34.)

Eleven days later, on April 24, 2006, plaintiff notified defendant of the accident and of his intent to make a claim on the policy. Plaintiff had already retained an attorney, Mr. Brenton D. Adams, who remains counsel for plaintiff in the instant lawsuit. Defendant immediately opened claims files for plaintiff and his wife for property damage and medical payments, and assigned

3

management of the claims to a claims representative.[1] Defendant also commenced an investigation into issues relating to coverage, liability, and damages, contacting plaintiff's counsel on April 26, 2006, to request a recorded statement from plaintiff and his wife.

As part of its investigation, defendant reviewed the police report and interviewed eyewitnesses to the accident. On May 8, 2006, defendant determined that the driver of the stolen SUV had been completely at fault for the accident. On May 9, 2006, defendant opened an uninsured motorist bodily injury claim for plaintiff and his wife based on the possibility that the driver of the stolen SUV was uninsured, but to continued to investigate whether the SUV's driver had insurance. Also on May 9, 2006, defendant paid plaintiff the sum of $1,650.90 on his property damage claim, based on a total loss of plaintiff's Saturn.

On May 17, 2006, defendant again requested that plaintiff and his wife provide a recorded statement and sign medical authorizations that would allow defendant to obtain plaintiff's medical records. These requests were memorialized in a letter sent to plaintiff's counsel on May 19, 2006, noting plaintiff's duty per the insurance policy to cooperate with the investigation of the claim and to authorize defendant to obtain medical reports and other pertinent records. The letter specifically requests, among other materials, an executed medical authorization form, a list of all medical providers, medical bills, and medical reports indicating the extent of plaintiff's injury.

Defendant contacted plaintiff and plaintiff's counsel seeking medical authorization and the recorded statements of plaintiff and his wife on as many as six occasions from May 26 to July 19, 2006, but these materials were not forthcoming. Having not yet received the authorization or

---

[1] Claims representative Jill Emmett was initially tasked with overseeing the claims. On May 11, 2006, primary responsibility for plaintiff's claims passed to casualty specialist Ryan J. Wright. Unless otherwise noted, the actions of these agents, and others working for defendant, are described herein simply as having been taken by defendant.

recorded statements on July 26, 2006, defendant sent plaintiff a reservation of rights letter reiterating the duty to cooperate in the investigation. Defendant contacted plaintiff's counsel four more times about this information following the reservation of rights letter, and plaintiff confirmed an appointment to take the recorded statements by telephone on September 26, 2006. A bad telephone connection forced the parties to abandon this plan, and the parties rescheduled for October 2, 2006.

Defendant called plaintiff's counsel on October 2, 2006, but was unable to take the recorded statements after being told that plaintiff and his wife had failed to appear at their counsel's office as scheduled. Defendant contacted plaintiff's counsel on four more occasions between October 5 and November 17, 2006, eventually sending a second reservation of rights letter. After more calls to plaintiff's counsel and another aborted attempt to take recorded statements from plaintiff and his wife after they again failed to appear, defendant was able to take the recorded statement of plaintiff's wife on January 17, 2007, and of plaintiff on February 7, 2007.

In his recorded statement, plaintiff told defendant that the right side of his body had been thrown into the passenger door when the vehicle in which he was a passenger was struck by the SUV. Plaintiff described the history of his back problems, beginning with his original workplace injury that resulted in a herniated disc and the series of six back surgeries since then to fix complications resulting from the initial injury. Plaintiff stated that he had been feeling better after this last surgery. He also informed defendant that before the accident, he felt pain almost exclusively on his left side, with pain or numbness down the left leg. Plaintiff claimed that after the accident, he had begun to feel pain down his right side as well. He had been going to a chiropractor following the accident, and was thinking about going to a pain management clinic. After the recorded statement was finished, the case manager working with plaintiff's counsel indicated that plaintiff's

counsel might send plaintiff to a neurologist or pain management specialist for an opinion on which symptoms were related to the pre-existing injury, and which were related to the accident.

Defendant obtained the executed medical records authorization form on January 29, 2007. Upon receiving the form, defendant forwarded them to the health care providers identified as having treated plaintiff over the previous five-year period. Plaintiff identified three health care providers: Cape Fear Valley Hospital, where plaintiff had received emergency care at the ER immediately following the accident; Dr. Rene Kotzen, the neurosurgeon who performed plaintiff's back surgery; and Dr. Rudolfo Reyes, plaintiff's primary care physician. By mid-June 2007, defendant had received the requested medical records and the bills for all treatment received by plaintiff following the accident.

Based on the materials it had received, defendant evaluated plaintiff's claim to determine whether any objective evidence indicated that the accident had aggravated plaintiff's existing back injury in a way that would cause lasting compensable consequences. From its review, which was not undertaken by a health care professional but rather by an experienced claims adjustor, defendant concluded that no objective evidence supported plaintiff's allegations that he had sustained a long-term injury or that his physical condition was materially different than it had been prior to the accident. In making this determination, defendant relied on (1) radiology records from the ER immediately following the accident which indicated that the surgical site was stable and that the x-ray findings were unchanged from previous findings; (2) plaintiff's discharge from the ER on the day of the accident, with instructions to follow the instructions already given to him by his neurosurgeon for post-operative recovery; and (3) the symptoms complained of by plaintiff, which were substantially similar to those already existing prior to the accident.

6

On June 12, 2007, plaintiff's counsel forwarded a demand for settlement accompanied by medical bills totaling $3,960.80. The majority of the bills related to plaintiff's treatment at the ER, with additional amounts relating to plaintiff's visit to the chiropractor and follow-up with his neurosurgeon. Based on the sums claimed in these bills, and its determination that plaintiff had not sustained any long-term injury beyond his pre-existing back injury, defendant developed a settlement range of $3,190.00 to $4,764.00 for the outstanding uninsured motorist claim.

On June 28, 2007, defendant offered a settlement of $1,190.00 in "new" money above the $2,000.00 already paid for medical expenses which defendant sought to offset from its total payment, reflecting a settlement amount of $3,190.00. Plaintiff rejected the initial offer on July 23, 2007, instead demanding $8,500.00. Settlement negotiations continued between plaintiff and defendant. On July 31, 2007, plaintiff and defendant were $750.00 apart in settlement negotiations, with defendant offering $4,750.00 and plaintiff demanding $5,500.00. However, the parties were not able to reach an agreement, and plaintiff through counsel informed defendant on August 13, 2007, that he was exercising his right under the policy to demand arbitration of his claim.

The parties continued settlement negotiations, and on September 11, 2007, defendant received a new demand for $25,000.00 from plaintiff. Unwilling to meet this demand, on October 5, 2007, defendant retained counsel to defend it in the upcoming arbitration proceeding and to engage in discovery in anticipation of arbitration.[2] As part of that discovery, plaintiff turned over a number of additional medical records, relating to the period both before and after the accident. Additionally, on October 7, 2008, defendant's counsel conducted an examination under oath

---

[2] Defendant has since retained different counsel for the instant matter. "Defendant's counsel," as used in this order, refers to defendant's counsel for arbitration.

("EUO") of plaintiff. The EUO was essentially a deposition of plaintiff by defendant's counsel, with plaintiff's counsel also present.

In the EUO, plaintiff stated that he believed he was entitled to lost wages because he was unable to work due to the accident. According to plaintiff, his neurosurgeon told him after his most recent surgery prior to the accident that there was a good chance he would be able to work again. Plaintiff stated that he had been feeling much better after the surgery and had noticed significant physical improvement, including less numbness in his lower left leg and ankle. According to plaintiff, the neurosurgeon had told plaintiff that he had done enough repairs to get plaintiff working again. Plaintiff stated that, during his follow-up appointment a few weeks after the surgery, his neurosurgeon informed him that the accident had "messed up" the results of the surgery. Plaintiff also informed defendant's counsel that he had previously been found fully disabled, presumably as a result of his back injury, and had been collecting full disability since 2005.

After plaintiff's EUO, the electronic claims record maintained by defendant indicate that defendant asked its counsel about the possibility of deposing Dr. Kotzen, plaintiff's neurosurgeon. The notes indicate that defendant's counsel believed that plaintiff didn't appear to have plans to depose Dr. Kotzen, and that it made strategic sense for defendant to avoid doing so because at best the deposition would be neutral and at worst would hurt defendant's case at arbitration. Defendant agreed that Dr. Kotzen was more likely to be an advocate for his patient and would probably emphasize the effect of the accident in a way not reflected in his treatment notes.

Defendant reviewed the additional information obtained through discovery in the arbitration process, and determined that none of the information provided any objective indication of a long-term injury caused by the accident. Nevertheless, defendant's counsel opined that plaintiff was likely

8

to recover between $4,000.00 and $25,000.00 at arbitration, with the most probable range of recovery being between $7,000.00 and $12,000.00. Based on this evaluation, defendant instructed defense counsel to offer a settlement proposal in the amount of $7,000.00 to plaintiff. Defendant's counsel apparently neglected to make the offer, and the matter proceeded to arbitration.

During the arbitration proceeding, plaintiff offered into evidence an opinion letter obtained from Dr. Kotzen in which the neurosurgeon opined that the surgery was successful and that he was certain that plaintiff's pain would not return as severely as before. Dr. Katzen also stated that he was confident that plaintiff would have been able to return to work again but for the accident, and that the accident was the cause for plaintiff's back problems subsequent to that surgery. Finally, Dr. Katzen opined that plaintiff was left totally disabled by the accident, with no avenue to return to work. This opinion letter, which was obtained for a fee of $500.00, had not been provided to defendant at any point prior to the arbitration proceeding.

At arbitration, plaintiff's counsel requested an award of $340,000.00 and defendant's counsel suggested an award of $5,000.00. On February 4, 2009, the three-person arbitration panel awarded plaintiff $38,346.80. Defendant issued a draft to pay plaintiff $36,346.80, taking into account the $2,000.00 already paid to plaintiff for medical expenses, the next day.

## DISCUSSION

A.   Standard of Review

Summary judgment is appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits show that there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the initial burden of

demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate with specific evidence that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Id. at 587; Anderson, 477 U.S. at 250.

B.  Analysis

Defendant seeks summary judgment in its favor on each of plaintiff's three claims for relief. Defendant contends that the undisputed facts show that it fully complied with the terms of the policy; that it is under no actionable duty of good faith under North Carolina law; that even assuming such a duty exists under North Carolina law, the undisputed evidence shows no conduct by defendant constituting bad faith or an unfair or deceptive trade practice; and that plaintiff is in effect impermissibly attempting to increase the arbitration award in this case.

Plaintiff seeks partial summary judgment solely on his UDTPA claim. Plaintiff contends that defendant violated N.C. Gen. Stat. § 58-63-15(11), governing unfair claim settlement practices by insurance companies. Plaintiff argues that a violation of § 58-63-15(11) is by law also a violation of the UDTPA. Defendant disagrees with the underlying premise that the insurer of an uninsured motorist policy has an actionable duty of good faith in these circumstances, and further argues that the undisputed facts do not establish any violation of § 58-63-15(11).

1.  Breach of Contract

Plaintiff's breach of contract claim is premised on allegations that defendant refused "without any justification or excuse . . . to pay the plaintiff anything for personal injury under his uninsured

motorist coverage and required plaintiff to hire a lawyer and arbitrate his claim." (Compl. ¶ 7.) The breach of contract claim also contains allegations that defendant "unlawfully and in bad faith failed to promptly settle and pay the claim." (Comp. ¶ 13) As damages for the alleged breach of contract, plaintiff requests attorney's fees and the costs of arbitration, which according to plaintiff "would not have been incurred . . . if the defendant had not breached its contract." (Compl. ¶ 15.)

The elements of a breach of contract claim under North Carolina law are (1) the existence of a valid contract and (2) the breach of the terms of that contract. Lake Mary Ltd. P'ship v. Johnston, 145 N.C. App. 525, 536, 551 S.E.2d 546, 554 (2001). The parties agree that a valid contract existed between plaintiff and defendant in the form of the insurance policy. But on the undisputed facts of the record, there was no breach of that contract by defendants.

In the policy, defendant agreed to pay "compensatory damages which [plaintiff] is legally entitled to recover from the owner or operator of an uninsured motor vehicle because of . . . bodily injury sustained by [plaintiff] and caused by the accident." (Def.'s Mot. Summ. J. Ex. 1 at 19.) North Carolina courts have interpreted this wording, which appears to be standard in uninsured motorist policies, as indicating that an insurer's obligation to pay is derivative of the underlying tort action against the uninsured motorist, and conditioned on recovery against that individual. See Brown v. Lumbermens Mut. Cas. Co., 285 N.C. 313, 319, 204 S.E.2d 829, 834 (1974); see also Silvers v. Horace Mann Ins. Co., 324 N.C. 289, 294, 378 S.E.2d 21, 25 (1989); McLaughlin v. Martin, 92 N.C. App. 368, 369, 374 S.E.2d 455, 456 (1988) ("Under the uninsured motorist coverage[,] . . . liability does not attach until a valid judgment is obtained against [the] uninsured motorist."). Although in the instant case the fact that the uninsured motorist was at fault was established early in defendant's investigation of the claim, the amount of damages was contested.

11

Because these damages are the measure of the uninsured motorist's liability, defendant was not liable under the contract to pay the claim until the extent of the uninsured motorist's liability for plaintiff's alleged aggravation of his back condition was established.

North Carolina courts have consistently rejected the view that an insured may sue an insurance company for breach of contract for failure to pay uninsured motorist benefits, instead holding that such actions take the form of a tort against the uninsured motorist, which the insurance company may defend. For example, in <u>Brown v. Lumbermens Mutual Casualty Company</u>, the North Carolina Supreme Court stated:

> Plaintiff's right to recover against his . . . insurer under the uninsured motorist endorsement is derivative and conditional. Unless he is 'legally entitled to recover damages' . . . from the uninsured motorist the contract upon which he sues precludes him from recovering against defendant. It is manifest, therefore, that despite the contractual relation between plaintiff insured and defendant insurer, this action is actually one for the tort allegedly committed by the uninsured motorist. Any defense available to the uninsured tort-feasor should be available to the insurer.

285 N.C. at 319, 204 S.E.2d at 834. <u>Brown</u> suggests that a breach of contract action would never be appropriate for this theory of recovery, even under more favorable facts.

Finally, the court notes that even if the breach of contract rubric applied, there is no merit to plaintiff's allegations that defendant breached the terms of the policy by "requir[ing] plaintiff to hire a lawyer and arbitrate his claim." First, it is undisputed that plaintiff hired an attorney even before notifying defendant of the accident. Second, the policy explicitly provides that an insured party may request arbitration in the event of a disagreement as to the amount of damages owed, which is precisely what happened here. Far from burdening plaintiff, the arbitration provision appears to allow plaintiff to choose arbitration as a less costly alternative to a tort suit against the uninsured motorist. If plaintiff wanted to recover costs and attorney's fees related to this arbitration, which is

the relief requested here, it was incumbent on him to make that request in the context of the arbitration proceedings, not in a separate lawsuit for breach of contract.

   2.   UDTPA Claim

The crux of plaintiff's UDTPA claim appears to be defendant's allegedly "high-handed[,] arrogant[,] and oppressive conduct towards the plaintiff in connection with his lawful pursuit of his right to recover benefits under the uninsured motorist provision of the . . . policy." (Compl. ¶ 23.) Plaintiff alleges that this conduct constitutes unfair claims settlement practices as defined in N.C. Gen. Stat. § 58-63-15(11), which conduct by law also violates the UDTPA. Specifically, plaintiff contends that defendant (1) compelled plaintiff to institute litigation to recover amounts due under the policy by offering substantially less than the amounts ultimately recovered in arbitration; (2) attempted to settle plaintiff's claim for less than the amount to which a reasonable man would have believed he was entitled; (3) did not attempt in good faith to effectuate a prompt, fair and equitable settlement of plaintiff's claim after liability had become clear; (4) failed to conduct a reasonable investigation based upon all available information; (5) failed to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies; and (6) failed to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies.

The UDTPA prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts of practices in or affecting commerce . . . ." N.C. Gen. Stat. § 75-1.1. To establish a violation of the UDTPA, plaintiff must show "(1) an unfair or deceptive act or practice, (2) in or affecting commerce, . . . (3) which proximately caused injury to plaintiff[]." Walker v. Fleetwood Homes of N.C., Inc., 362 N.C. 63, 71-72, 653 S.E.2d 393, 399 (2007). The first two elements may

be met by a showing that an insurer violated N.C. Gen. Stat. § 58-63-15(11), which enumerates a number of acts which, when "committ[ed] or perform[ed] with such frequency as to indicate a general business practice," are as a matter of law unfair methods of competition and unfair and deceptive acts or practices in the business of insurance. See Murray v. Nationwide Mut. Ins. Co., 123 N.C. App. 1, 472 S.E.2d 358 (1996).[3] North Carolina courts accordingly construe § 75-1.1 as providing an insured with a private cause of action for an insurer's violation of § 58-63-15(11). See id.; Miller v. Nationwide Mut. Ins. Co., 112 N.C. App. 295, 302, 435 S.E.2d 537, 542 (1993).

Defendant argues that the court should treat a policy providing for uninsured motorist coverage differently than other insurance policies, and thus find the UDTPA and § 58-63-15(11) inapplicable to plaintiff's claim, because an insurer of such a policy takes an adversarial posture to the insured by acting in the place of the uninsured motorist. This contention is without merit.[4] North Carolina courts hold uninsured motorist policies to the same standards set forth in § 58-63-15(11) as other policies. See Martini v. Companion Prop. & Cas. Ins. Co., 679 S.E.2d 156, 160-61 (N.C. Ct. App. 2009) (reversing lower court's grant of summary judgment to insurer on § 75-1.1 claim against insurer of underinsured/uninsured motorist policy because genuine issues of material fact

---

[3] "The business of insurance is unquestionably 'in commerce' insofar as an 'exchange of value' occurs when a consumer purchases an insurance policy ... and people who buy insurance are consumers whose welfare [the UDTPA] was intended to protect." Pearce v. Am. Defender Life Ins. Co., 316 N.C. 461, 469, 343 S.E.2d 174, 179 (1986).

[4] In Weese v. Nationwide Insurance Co., a case involving an uninsured motorist policy under West Virginia law, the Fourth Circuit succinctly described the fallacy in this argument:
> [Defendant] contends that uninsured motorist coverage affords only hybrid first party protection because the relationship between the insurer and insured is adversarial until the insured recovers a judgment against the uninsured motorist. We reject this argument. [Defendant] fails to recognize that all first party claims are adversarial. The insurer wishes to minimize payment and the insured wishes to maximize it. . . . [Despite this adversarial posture], the Court [will hold] the insurer to its contractual obligations of fair dealing in settlement negotiations.

879 F.2d 115, 118 (4th Cir. 1989). The ultimate outcome in Weese was of course governed by West Virginia law, which is inapplicable here.

14

existed as to whether insurer had violated § 58-63-15(11) by failing to conduct a reasonable and complete investigation before denying plaintiff's claim and failing to follow its own claims handling guidelines), rev'd on other grounds by 364 N.C. 234, 695 S.E.2d 101 (N.C. 2010) (per curiam).

Defendant next argues that even if it is bound by the terms of § 58-63-15(11), the undisputed evidence does not establish any violation of that provision. The court agrees. The undisputed facts leave no room for a finding that defendant engaged in unfair claims settlement practices. Defendant immediately began its investigation into plaintiff's claim upon learning of the accident from plaintiff on April 24, 2006. Defendant quickly established that the uninsured driver of the SUV was completely at fault in the accident, and sought a recorded statement and medical documentation from plaintiff and his wife. However, plaintiff was slow to get this information to defendant. Eventually, based on the records provided, defendant concluded that there was no objective evidence to support a new or enduring injury sustained by plaintiff in the accident, and offered to settle the claim for the value of the costs directly associated with the accident.

These undisputed facts conclusively demonstrate that defendant thoroughly investigated this matter and promptly offered a settlement once it had determined both the nature and scope of liability. Based on the medical records provided by plaintiff's physicians, defendant asserted that plaintiff had suffered no new injury nor permanently aggravated his existing back condition, and plaintiff has forecast no evidence that the offer to settle the claim for the medical costs directly associated with the accident was unreasonable in this light.[5] Defendant's position on causation and

---

[5] Plaintiff argues that the opinion of Dr. Kotzen establishes that the accident greatly exacerbated his existing back injury, and that defendant had a duty to seek out this information. Plaintiff has not pointed to any case requiring an insurer to interview an insured's physician, and the argument that an insurance company acts unreasonably in relying on medical records provided by medical professionals cannot be entertained.

15

damages was made clear to plaintiff in the settlement process, and plaintiff was not restricted in providing any additional evidence that would support its own theory of causation. Finally, plaintiff's argument that an insurance company must immediately pay its own settlement offer as the "undisputed" portion of the claim, even if settlement is rejected by the insured, is without merit.

Ultimately, although plaintiff cites many different provisions within § 58-63-15(11), plaintiff's claim boils down to an argument that defendant acted unlawfully by "[c]ompelling [plaintiff] to institute litigation to recover amounts due under [the] insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by [plaintiff]." N.C. Gen. Stat. § 58-63-15(11)(g). This argument is facially appealing, but ultimately unconvincing. Although plaintiff did institute an action in the form of the arbitration proceeding to obtain the amount due on the claim, and though each of defendant's settlement offers was substantially less than the $38,346.80 ultimately awarded by the arbitrators, it was not defendant who compelled plaintiff to institute litigation. Rather, it was North Carolina law, in which the amount "due under [an uninsured motorist] policy" is conclusively determined in litigation against the uninsured motorist, that compelled this result. See Brown, 285 N.C. at 319, 204 S.E.2d at 834; McLaughlin, 92 N.C. App. at 369, 374 S.E.2d at 456. As already noted, the insurance policy allowed plaintiff to institute arbitration instead of litigation, and plaintiff opted for this course.

    3.    Punitive Damages Claim for Breach of Covenant of Good Faith and Fair Dealing

Plaintiff's final claim, incorporating all of the previously mentioned allegations, is that defendant failed to act in good faith and failed to deal fairly with plaintiff in its handling of his uninsured motorist claim. It is well-settled under North Carolina law that "[a] bad faith refusal to provide insurance coverage or to pay a justifiable claim may give rise to a claim for punitive

damages." Miller, 112 N.C. App. at 305, 435 S.E.2d at 544. "In order to recover punitive damages for the tort of an insurance company's bad faith refusal to settle, the plaintiff must prove (1) a refusal to pay after recognition of a valid claim, (2) bad faith, and (3) aggravating or outrageous conduct." Lovell v. Nationwide Mut. Ins. Co., 108 N.C. App. 416, 420, 424 S.E.2d 181, 184 (1993). "[B]ad faith means 'not based on honest disagreement or innocent mistake.'" Id. at 421, 424 S.E.2d at 185 (quoting Dailey v. Integon Gen. Ins. Corp., 75 N.C. App. 387, 396, 331 S.E.2d 148, 155 (1985)). "Aggravated conduct may be shown by fraud, malice, gross negligence, insult, rudeness, oppression, or wanton and reckless disregard of plaintiff's rights." Id. at 422, 424 S.E.2d at 185.

Defendant argues that plaintiff has failed to set forth a claim for punitive damages for an alleged bad faith refusal to settle, and the court agrees. First, defendant did not refuse to pay after the recognition of a valid claim. North Carolina law establishes the amount of the claim as that which could be recovered from the uninsured motorist in tort, and this had not been established at the time of defendant's settlement offers. See Brown, 285 N.C. at 319, 204 S.E.2d at 834; McLaughlin, 92 N.C. App. at 369, 374 S.E.2d at 456. Once the validity of the claim was recognized by the arbitration panel, defendant immediately paid the claim. Second, defendant did not act in bad faith. The undisputed facts establish an honest disagreement as to the amount of the claim, and the policy specifically allows for such disagreements to be settled by arbitration. Again, defendant immediately paid the claim once this disagreement was settled in arbitration. Finally, plaintiff has put forward absolutely no credible allegations of fraud, malice, gross negligence, insult, rudeness, oppression, or wanton and reckless disregard of plaintiff's rights. As already noted, the undisputed facts do not support a cause of action under § 75-1.1, incorporating the provisions of § 58-63-15(11), and much less do they support a finding of aggravated conduct on the part of defendant.

C.  Defendant's Motion to Exclude Certain Expert Witness Testimony

Also pending is defendant's uncontested motion to exclude the testimony of plaintiff's designated expert witness Donald L. Dinsmore. Neither party relied on Mr. Dinsmore's deposition testimony or expert report in support of or in opposition to summary judgment. Moreover, because the court concludes that summary judgment is appropriate for defendant, there will be no trial in this matter. Accordingly, defendant's motion relating to anticipated trial testimony is denied as moot.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (DE # 11) is GRANTED and plaintiff's motion for partial summary judgment (DE # 13) is DENIED. Defendant's motion to exclude the testimony of plaintiff's designated expert witness Donald L. Dinsmore (DE # 12) is DENIED AS MOOT. The clerk is directed to enter judgment for defendant and to close this case.

SO ORDERED, this the 27 day of October, 2010.

LOUISE W. FLANAGAN
Chief United States District Judge